**STATE of Alaska, Appellant,**

v.

**Andrew D. GONZALES, Appellee.**

**No. A-8653.**

Court of Appeals of Alaska.

Oct. 7, 2005.

---

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, Gregg D. Renkes, Attorney General, and Scott J. Nordstrand, Acting Attorney General, Juneau, for the Appellant.

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

In January 1992, the Anchorage police uncovered evidence that Andrew D. Gonzales had sexually abused his girlfriend's daughter, A.D. During the investigation, the police contacted Gonzales for an interview. He left the state within days of the contact. By July 1992, the investigation was dormant.

Ten years later, the police discovered that Gonzales had returned to Alaska. The 1992 case was reopened and the grand jury indicted Gonzales in September 2002 for several counts of sexual abuse of a minor based on the 1992 allegations. The grand jury also indicted Gonzales for several counts of distribution and possession of child pornography based on conduct in 2002.

Gonzales moved to dismiss the counts that were based on the 1992 allegations. Gonzales argued that the ten-year delay between the 1992 discovery and investigation of the allegations and the 2002 indictment was unreasonable and prejudiced him. Gonzales argued that he was prejudiced because several items of evidence collected by the police in 1992 had been lost.

Superior Court Judge Michael L. Wolverton granted Gonzales's motion to dismiss. Because we conclude that Judge Wolverton's ruling was not an abuse of discretion, we affirm.

*Background and proceedings*

During a traffic stop on January 5, 1992, an Alaska State Trooper noticed sexually explicit drawings of a juvenile female on the floor of Gonzales's car. Later that day the state troopers interviewed A.D., the juvenile daughter of Gonzales's girlfriend (D.D.), to investigate whether Gonzales had depicted her in the drawing, and whether he had sexually abused her. In the interview, A.D., who was ten years old at the time, denied that Gonzales had ever drawn her naked and denied that he had sexually abused her.

The troopers referred the investigation to the Anchorage Police Department. Anchorage Police Detective Linda Branchflower reinterviewed A.D. on January 15, 1992. During this interview, A.D. stated that Gonzales had sexually abused her by taking her clothes off and fondling her genital area and by touching her with his penis. Detective Branchflower videotaped an interview with A.D., her younger brother, M.D., and her mother, D.D.

The next day, Detective Branchflower executed a search warrant on Gonzales's residence. The day after executing the warrant, Branchflower learned from D.D. that Gonzales said that the police missed a videotape hidden in his kitchen. Branchflower contacted Gonzales at his work and asked him to come to the police station for an interview. Branchflower assured Gonzales that no matter what he told her in the interview, she would allow him to leave without being placed under arrest. Gonzales agreed to an interview at the police station.

During the interview, Gonzales admitted that the illustrations found by state troopers in his car were of A.D., but said that she had not posed for them. When the detective confronted Gonzales about A.D.'s allegations of sexual abuse, he requested an attorney. Branchflower ended the interview, but told Gonzales that if he changed his mind about talking to her further, she was still interested in getting his side of the story.

Gonzales left the state soon after this interview. Detective Branchflower attempted to locate Gonzales by searching databases that would show whether Gonzales had applied for a driver's license or had committed a crime in Florida, Nevada, or Washington—states where she had heard Gonzales might be residing. But Branchflower did not locate Gonzales. Branchflower suspended the Gonzales investigation in July of 1992.

Gonzales returned to Alaska in December of 2001. When Anchorage Police Detective Kristie Neddeau learned that Gonzales was residing in Alaska, she resumed the investigation. In September 2002, the grand jury indicted Gonzales for four counts of first-degree sexual abuse of a minor, two counts of second-degree sexual abuse of a minor, and one count of attempted first-degree sexual abuse of a minor,[1] based on Gonzales's alleged abuse of A.D. during 1991 and 1992. In addition, the grand jury indicted Gonzales on three counts of distribution of child pornography and seven counts of possession of child pornography, based on conduct in 2002.[2]

Gonzales moved to dismiss the sexual abuse of a minor charges on the ground of prejudicial pre-accusation delay. While the case was dormant, the police lost most of the recordings of the interviews that Branchflower conducted, including the videotape of her interview with A.D. on January 15, 1992, and the tape recording of Branchflower's interview with Gonzales. At the evidentiary hearing on the motion, Judge Wolverton heard

---

1. AS 11.41.434(a)(1); 11.41.436(a)(2); 11.41.434(a)(1) & 11.31.100, respectively.

2. AS 11.61.125(a) & 11.61.127, respectively.

testimony from Gonzales, his son, Andrew Gonzales Jr., and from Branchflower, who had retired before the case was revived.

After the parties submitted additional briefing and presented argument, Judge Wolverton granted Gonzales's motion to dismiss the first seven counts of the indictment involving sexual abuse of a minor. Judge Wolverton explained:

> [T]here was no good reason set forth for the delay. I'm going to find also that because the tapes were missing, among[ ] other items of evidence ... that I would have granted the motion under *Fletcher*[3] to give an instruction to the jury that they would have presumed that the evidence would have been favorable to the defendant. In my view that sort of finding ... is equivalent to actual prejudice.

Judge Wolverton issued a summary written order granting Gonzales's motion. He severed the first seven counts involving sexual abuse of a minor from the remaining counts based on his conduct in 2002. The State now appeals.

*Judge Wolverton did not abuse his discretion by dismissing the charges*

The State argues that Judge Wolverton erred by dismissing the sexual abuse charges in the indictment. The State claims that the delay was reasonable and did not prejudice Gonzales.

■ We noted in *State v. Mouser*[4] that the due process clauses of the United States and Alaska Constitutions protect defendants against unreasonable pre-accusation delay.[5] The primary concern of the rule against unreasonable pre-accusation delay is not the length of the delay, but the harm to the defendant's ability to present a defense.[6] In order to prove unreasonable pre-accusation delay, a defendant must show (1) that the State lacked a valid reason for the delay, and (2) that the delay prejudiced the defendant.[7]

■ To assess a claim of pre-indictment delay, courts must balance the State's interest in postponing accusation against the defendant's interest in early notice of the charges against him.[8] We review the superior court's decision to grant the motion to dismiss for an abuse of discretion.[9]

As we mentioned above, Judge Wolverton found that the State lacked a valid reason for the delay in indicting Gonzales. Judge Wolverton also concluded that Gonzales was prejudiced by the delay.

■ The State contends that the delay in indicting Gonzales was justified because of Gonzales's flight from Alaska. The State claims that Detective Branchflower did not refer the case to the district attorney because she wanted to interview Gonzales again to obtain his side of the story, but she could not do so because Gonzales had left Alaska. But this contention overlooks the fact that when Detective Branchflower had interviewed Gonzales, he invoked his right to counsel and Branchflower had no plan to contact him again. The record shows no reason to believe that further contact would have been productive.

The State next argues that Detective Branchflower did not refer the case to the district attorney because she believed she needed to interview A.D. again to obtain additional corroborating evidence. The State claims that Branchflower was unable to obtain an additional interview with A.D. because A.D. was admitted to Charter North Hospital intermittently. Branchflower initially testified that she could not interview A.D. a second time because of A.D.'s psychiatric condition. When asked to clarify what condition she was referring to, Branchflower explained that about two weeks after A.D.'s

---

3. *Fletcher v. Anchorage*, 650 P.2d 417, 418 (Alaska App.1982) (stating that a trial court can instruct the jury to assume that lost evidence would have been favorable to defendant).

4. 806 P.2d 330 (Alaska App.1991).

5. *Mouser*, 806 P.2d at 336.

6. *Id.*

7. *Id.*

8. *Id.*

9. *See Clark v. State*, 953 P.2d 159, 163 (Alaska App.1998).

interview Branchflower received a call from a patrol officer who had responded to a situation at D.D.'s residence. The officer said that A.D. was acting strangely and that he was concerned for her welfare. Branchflower spoke with D.D. and suggested that she get A.D. into counseling immediately. Branchflower testified that A.D. spent some time at Charter North Hospital, but that by July of 1992 she was no longer there. Branchflower testified that A.D. was in and out of Charter North several times between January and July. But Branchflower testified that she was not apprized of A.D.'s treatment. And Branchflower testified that when she suspended the investigation of Gonzales, A.D. was out of the hospital. Branchflower also stated that she never tried to interview A.D. a second time and that A.D.'s mother never refused a second interview.

There is another problem with the State's argument that Detective Branchflower was unable to pursue the investigation because of A.D.'s psychiatric problems. The State also ignores that Detective Branchflower had previously conducted a videotaped interview of A.D. on January 15, 1992, in which A.D. not only stated that Gonzales had abused her but also described how and when and approximately how many times Gonzales had done so. Detective Branchflower testified that the only reason she wanted to interview A.D. a second time was to ascertain whether there was any more information that A.D. had not already provided, and to ascertain whether A.D. had been telling the truth in her previous statement. But Branchflower admitted that A.D.'s statement was a fairly complete accounting of specific instances of sexual abuse by Gonzales. And Branchflower admitted that the interview with A.D. ended, not because A.D. had refused to answer more questions but rather because Branchflower had independently decided to conclude the interview. There is no indication in the record that Branchflower planned to interview A.D. a second time because she doubted the veracity of A.D.'s prior statements. Therefore, the State presented no evidence that

Branchflower either wanted to or was unable to interview A.D. a second time. Based on all these considerations, Judge Wolverton could reasonably conclude that Branchflower did not suspend the investigation because she could not interview A.D. a second time. Thus, the State presented no evidence justifying the delay.

The State also attacks Judge Wolverton's ruling by arguing that he failed to show sufficient deference to the prosecution's discretion of when to indict a suspect. The State relies on *United States v. Lovasco*[10] for the proposition that courts cannot require a prosecutor to seek an indictment as soon as the prosecutor has probable cause to believe an accused is guilty.[11] But Judge Wolverton's ruling did not infringe on the prosecution's right to decide when to charge Gonzales. Instead, Judge Wolverton ruled that the ten-year delay in charging Gonzales was not reasonable.

When a court considers a claim of unreasonable pre-indictment delay, the court must "weigh the governmental interest in postponing accusation against the defendant's interest in early notice of the pending charges."[12] We reject the State's assertion that Judge Wolverton intruded on the State's prosecutorial discretion by concluding that the pre-accusation delay was not reasonable.

Furthermore, Judge Wolverton did not rule that the State had delayed the indictment unreasonably because it had failed to indict after obtaining probable cause. Rather, Judge Wolverton found that the State had presented no valid reason for indicting Gonzales after the case was dormant for ten years. Therefore, Judge Wolverton did not intrude on the State's discretion as to when to bring charges against a suspect.

The State next argues that Gonzales failed to prove that the State's delay in indicting him prejudiced his ability to present a defense. As mentioned above, Judge Wolverton found that the State's loss of video and audio tape records of interviews conduct-

---

10. 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

11. *Lovasco*, 431 U.S. at 790–91, 97 S.Ct. at 2049.

12. *Mouser*, 806 P.2d at 336.

ed by Detective Branchflower prejudiced Gonzales.

During the ten-year delay between the beginning of the Gonzales investigation and the indictment against him, the police lost video and audio tapes of interviews Branchflower had conducted with several witnesses. The police lost tapes of interviews Branchflower had conducted in 1992 with A.D., M.D. (A.D.'s younger brother), Gonzales, D.D. (A.D.'s mother), Art Costa (Gonzales's ex-father-in-law), Deolinda Gonzales (Gonzales's ex-wife), Andrew Gonzales Jr. (Gonzales's son) and K.G. (a self-professed second victim). Some of the tapes were audio and some were video, and Branchflower interviewed some witnesses twice. However, the State provided Gonzales with transcripts of all interviews except the interview with Gonzales himself. Apparently, that tape was never transcribed.

In the superior court, Gonzales argued that the loss of two tapes in particular damaged his defense—(1) the tape of Gonzales's interview, and (2) the videotape of A.D.'s interview in which she first claimed that Gonzales had not abused her but then claimed that he had. Gonzales argues that the audiotape of his interview would allow him to show his disbelief at the allegations against him. And Gonzales emphasizes that, unlike the other interviews, no transcript of this interview exists. Gonzales argues that the lost videotape of the A.D. interview would have allowed the jury to assess her credibility based on her demeanor, and to determine whether A.D. was "reacting to subtle cues from the investigator." Gonzales argues that the transcript of A.D.'s interview is inadequate to assess credibility because the jury could not observe her demeanor. In addition, Gonzales argues that the transcript of A.D.'s interview prevents him from presenting a defense because the transcript contains seventy-six instances in which the transcriber could not decipher A.D.'s response to the question. Finally, Gonzales argues that the transcript of A.D.'s interview fails to communicate what A.D. was referring to when De-

tective Branchflower and A.D. used anatomical dolls, rather than verbal communication, to show what Gonzales allegedly did to her.

The State argues that Gonzales and Detective Branchflower could both testify at trial regarding Gonzales's interview, such that the lost tape would not harm Gonzales's defense. But, Branchflower stated that she only "vaguely" remembered the interview, and that she could not provide details about it beyond those in · her report. Further, Branchflower did not testify at the evidentiary hearing as to Gonzales's demeanor, nor does Branchflower's report discuss his demeanor.

The State also argues that Gonzales's claim of prejudice regarding the lost videotape of A.D.'s interview is speculative. The State points out that the audiotape of A.D.'s January 5, 1992, interview with the state troopers (preceding Detective Branchflower's January 15 interview of A.D.), in which A.D. consistently denied that Gonzales had abused her, was available for Gonzales's use. The State argues that the troopers' tape, together with Detective Branchflower's notes and the transcript of her interview of A.D., provide Gonzales with sufficient impeachment evidence for trial.

In *Mouser*, we rejected a claim of prejudice based merely on the claim that witnesses' memories had faded.[13] We stated that because delay is a two-edged sword, witnesses' faded recollections can make it more difficult for the State to carry its burden, thus actually aiding the defendant.[14] We ruled that a defendant claiming unreasonable delay must show a specific and substantial harm resulting from the delay that impaired his ability to present a defense.[15]

Unlike the situation in *Mouser*, Gonzales does not allege a general harm of faded witness memory and difficulty obtaining witnesses. Instead, Gonzales claims that the loss of two particular tapes limited his ability to present a defense. Even without considering the utility or prejudice resulting from the loss of the tape of Branchflower's interview with Gonzales, Judge Wolverton could

13. *Mouser*, 806 P.2d at 336–37.

14. *Id.* at 337.

15. *Id.*

reasonably conclude that the loss of the videotape of A.D.'s interview with Detective Branchflower had prejudiced Gonzales. That tape may have provided fruitful grounds to attack A.D.'s credibility or challenge Branchflower's investigation.

Finally, the State argues that Judge Wolverton could have imposed a lesser sanction on the State than dismissing the seven sexual abuse counts against Gonzales. We have noted that trial courts are not automatically required to impose any sanction when the State loses or destroys evidence in its possession.[16] But the issue before Judge Wolverton was whether due process was violated when the State unreasonably delayed indictment, thereby prejudicing Gonzales's ability to present a defense. The State has not cited a case that permits a judge to consider lesser sanctions than dismissal of the charge when there is prejudicial pre-accusation delay nor have we found such a case.

### Conclusion

The judgment of the superior court is AFFIRMED.

---

**16.** *State v. Ward,* 17 P.3d 87, 89 (Alaska App. 2001).